The second case is 24-4114 United States v. Jackson. Mr. Macbeth. Good morning, Your Honors. My name is Cullen Macbeth and I represent the appellant Brandon Jackson. Your Honors, Mr. Jackson was indicted in Arizona State Court after police searched the trunk of his car and found a gun that belonged to his passenger. There was no allegation that Mr. Jackson engaged in any violent or threatening conduct with the firearm. And in fact, two separate judges in Arizona State Court conducted individualized, evidence-based dangerousness assessments and concluded that Mr. Jackson was not dangerous and did not pose a threat to other people. They even determined that he could be released pretrial without imposing a no-firearms condition on him. Mr. Jackson's passenger, to whom the gun belonged, later pled guilty to possessing it. Mr. Jackson did not, as it was not his gun. Indeed, the weapons charge against Mr. Jackson Your challenge here has applied. Correct, Your Honor. But particularly when this particular client was put in this position, having this gun, he was under indictment at the time. When he traveled from Arizona to Maryland, yes, he was under indictment at that time. So none of the conduct that you, or at least the consequences of what happened were in play at that time. They had not been dismissed. No, Your Honor. So squarely he fits within the statute. Correct. We're not saying he's You're saying that there are measures here that exist as to him, but why it should not be applied to him. What in particular are you relying upon? And why should we take that route and allow the way we've treated the 922G determination of this sort? We've looked at it more categorically than we have on a case-by-case basis. Maybe we're trying to reduce our workload or whatever, but at the end of the day, if you put him in a category, if he's under indictment, it fits there clearly. It falls back into facial analysis, and we just haven't ventured there too much. There's not too many other circuits. I don't know if any circuits have gone there to apply it in that way, but maybe you can tell me they have been. So first of all, Your Honor, yes, we agree that he's, Mr. Jackson's covered by the text of the statute. There's no dispute about that. The question is whether it's constitutional to apply it to him. As to the question of sort of categorical facial judgments, I assume you're referring to the Hunt opinion. Absolutely. And we think Hunt is inapplicable for several reasons. So Hunt had essentially three rationales to it, none of which we think is applicable to 922N. The first was that at the step one of Bruin, the Second Amendment protects only, quote, law-abiding people. And we think that a grand jury indictment is not a sufficient basis to determine who is and is not law-abiding. Law-abiding can't just mean anybody who has ever broken any law at any time in the past, because if it's that broad, then absolutely nobody is law-abiding. So there has to be some limiting principle to what law-abiding means, and we think a grand jury indictment is not a sufficient basis to draw that distinction for a number of reasons. First of all, it's a non-adversarial process. So defendants do not get a chance to appear in front of a grand jury. They can't cross-examine the government's witnesses. They can't present their own evidence. The rules of evidence do not apply, so grand jurors can consider hearsay, propensity evidence, other evidence that is irrelevant or prejudicial. The exclusionary rule does not apply. The standard of proof is just probable cause, which is lower even than preponderance of the evidence. And a unanimous vote is not required to return a true bill. So, you know, we've all heard the famous expression that a grand jury would indict a ham sandwich if a prosecutor asked it to, and that's because it's a very, very, very minimal showing that it's required to get an indictment. And it's really not much more than the fact that the police have arrested somebody. Grand juries tend to indict when prosecutors ask them to. So I acknowledge the sort of law-abiding language from Hunt, but I don't think that can sweep in absolutely everybody who has ever supposedly broken the law, and there has to be that dividing line. The second rationale of Hunt. On that point, the indictment is temporary. Correct. It's correct. But the reason that this is unlike other courts, including the Supreme Court, has said that other constitutional rights can be burdened to some extent during the indictment period. Like, obviously, people can be detained. It doesn't violate due process. But the difference in this case is that basically he could be detained under the indictment alone, for which he would not be permitted to have a gun. But you are saying to give him the lesser option of we're going to let you go free, but the statute says you can't have a gun. You don't like that. Well, so I think the ‑‑I take it you're referring to the pretrial detention analog or tradition. Yeah, we have to get ahead of that because I think we're eventually going to get ahead of that. Okay. So just on the point about other rights, the difference, and the Ninth Circuit makes this point in the Perez-Garcia case, which we cite, is that if you deem somebody non-law-abiding at Bruin Step 1, that doesn't simply mean the government can limit those people's rights to the Second Amendment. It means they can categorically deny them all Second Amendment rights whatsoever because under Hunt, if you are non-law-abiding, you're out entirely. You lose all rights under the Second Amendment. And so the government is entitled not just to sort of impose reasonable restrictions on a right but to actually completely strip you of all rights. So I think it is different from the way that an indictment is used to limit other constitutional rights in the indictment period. Does it matter that unlike Hunt, which dealt with the right of felons to bear and keep arms, that this is an indictment which is a temporary restriction on, presumably, on someone's ability to bear arms? So it would matter if, you know, there's some analog that is similar to that in that it imposed a temporary disarmament. The absolute burden I don't think is relevant. That might have been relevant in the old means and scrutiny system where we're sort of measuring how severe a burden it is and balancing that against public safety interests. But now the temporary nature of the deprivation is necessary only to the extent that that makes it similar to some other analog. Now the government has cited pretrial detention and surety statutes, both of which did involve temporary disarmaments. But those analogs are very different in very fundamental ways. So in both of those cases, with both surety statutes and pretrial detention, there was an individualized, evidence-based, adversarial determination that a particular person was actually dangerous and needed to be disarmed. We don't have that with 922-N. In fact, 922-N disarms all indictees across the board without any individualized process as to their dangerousness. And in fact, in this case, as I said earlier, we actually have an individualized determination that goes the other way. Two separate judges in Arizona did an individualized, adversarial, evidence-based assessment, and they both concluded that Mr. Jackson was not dangerous and that he could be released without restricting his access to firearms. And I think there is no analog for something like that. There's no historical analog that says when a judge, a neutral judge, has determined that you are not dangerous based on an adversarial proceeding, we nonetheless can take away your firearms. There's just nothing like that. Did the district court consider or at least determine whether or not those determinations, which were made in other contexts, right, should apply in this case? The district court really did not address our as-applied challenge in much detail. The court did what is almost entirely a facial analysis and then sort of said at the end, very briefly, I also reject the as-applied analysis and I find it irrelevant that the charges were eventually dismissed. And to Judge Wynne's point earlier, I think strictly as a legal matter, it is irrelevant that the charges were later dismissed. But the reason I cite that fact. So the district court said it was irrelevant that the charges were dismissed, but did the district court specifically address the fact that he'd been released on his own recognizance and did not have his firearm? No, Your Honor. The court did not address that fact. That fact was in our pleadings. I believe I mentioned it at the evidentiary hearing. The court didn't say anything about that fact. And again, the fact that the charges were dismissed, I take Judge Wynne's point that that's irrelevant to whether he was, in fact, under indictment when he traveled here. But the reason I highlight that fact is that I think it's really good evidence of just how unreliable grand juries are. The state in Arizona later determined that that was not Mr. Jackson's weapon, and they therefore dismissed the charge. Nevertheless, he was under indictment because a grand jury will indict through a non-adversarial process under a lot of circumstances. So we could undertake this. It looks like we have felon-by-felon litigation. Hunt said that it was a felony in possession. We won't do that. We won't do the felony-by-felony litigation. And there are felonies that are non-violent. And yet Hunt said in the context of 922G, we don't do that. Why should it be different here? Why should we now go felony-by-felony to determine whether that applies here? He did it in a categorical fashion. So I think the starting point is this dangerousness principle that Hunt articulates has to have some kind of limiting principle, just like the law-abiding principle has to have a stopping point. There must be some limiting principle. It cannot be that Congress can simply deem any category of people it wants to be dangerous, and then this court will just defer to that. Well, the limiting principle here, at least as Judge Diaz alluded to, is that this is a temporary situation here. Whereas in Hunt, if you have a felon in possession of a non-violent felony, we said that's okay. And so it seems like to me this is far more limiting than we had in Hunt. So the length of the deprivation is shorter, but I don't think that bears on the initial judgment of whether a category is dangerous or not. That judgment, whether a category of people is dangerous, I don't think, you know. See, that's the part I'm not quite understanding because Hunt does take into consideration that we don't look felony-by-felony, and there are in the full circuit non-violent felonies for which you can be deprived of possession of a gun. Sure. So Hunt says you – So the whole dangerousness doesn't come into play in Hunt under 922G. I realize we're on a not-an-end, but it seems I don't see the difference. So why we should do differently. So it doesn't come into play on the individual level. It does at the level of the category. Hunt says Congress, at least in some circumstances, can determine or judge a category of people to be dangerous and disarm them all. And I'm saying there has to be some scrutiny of whether a group actually is dangerous. I mean, if Congress passed a law saying, you know, redheads are dangerous and therefore they can't possess firearms, I hope and assume this Court would not simply defer to that and take it at face value. The point is, agree, not all felon indictees are dangerous, but neither are all felons. Sure. That's the point. It's the same situation. In other words, you pointed to the consideration of dangerousness in the indictment context, but we don't even use it in the context of a felon. It doesn't have to be dangerous in order for 922G to apply to it under Hunt. Sure. That's the point. Why is it different with 922N? So I think the difference is in 922G1, this Court was, in some sense, deeming it reasonable for Congress to say that felons as a group are dangerous. And my point is we can't just assume that every time Congress deems a group dangerous, that that's reasonable. And Hunt points to sort of two limitations on how that dangerousness principle might be capped. One is Hunt relies in substantial part on the fact that the Supreme Court has repeatedly said that felon disarmament laws are presumptively lawful. The Supreme Court has never said anything about laws disarming indictees. The second is Hunt, if you look at the statutes, the historical analogs on which the dangerousness category is based, it's talking about people who are a particular kind of danger. So it talks about groups that I think can be categorized as either disloyal groups, which in Hunt was British loyalists, Native Americans, and religious minorities, or lawbreakers like felons who have been convicted of a felony. Those are the kinds of groups that underlie the dangerousness category. And I don't think indictees fit in either of those. They're not disloyal. I don't think anyone claims that. And they're not lawbreaking in the same way that felons are for all the reasons I mentioned earlier. It's simply an accusation that relies on a non-adversarial process with a non-unanimous vote with an extremely low burden of proof where the government can introduce irrelevant evidence, evidence that would be excluded under the exclusionary rule, et cetera. And so there's not a basis for deeming those people to be lawbreakers in the same way that there is for felons. Hunt, you know, it says several times, you know, that there's a historical tradition of regulating non-law-abiding persons when it's explaining dangerousness. It says that a risk of dangerousness readily attaches to people who have already been found guilty of having broken the law. So it may be reasonable to assume that felons who have been convicted fall in that category. But I don't think it's reasonable to make the same blanket assumption about people who have merely been indicted. It's inconsistent, I think, with the presumption of innocence. Again, as the Ninth Circuit said in Perez-Garcia, even the Sixth Circuit in Gore, which rejected a facial challenge to the statute, said at step one that it's inconsistent with the presumption of innocence to categorically deem indictees to be non-law-abiding and therefore outside the scope of the Second Amendment. Well, there's the action of the prosecutor here, too. The ham sandwich analogy is interesting, but ultimately it's the prosecutor that makes this determination, and the prosecutor makes the determination that, well, I can get a conviction on you for a crime that you could be put in jail for more than a year. And that would seem to indicate there's some condition of dangerousness to it. I mean, you can actually convict of it, and I guess you would agree, if he was actually convicted of it and he's possessing it, then you, of the crime here beyond the indictment, your problem is it's only at the indictment stage or the charging stage, and it's not at a conviction, and there should be a distinction between being indicted as opposed to being convicted. Is that the prophecy? Correct, Your Honor, yes. Under Houghton, if he had been convicted, obviously he could be disarmed. Does anybody agree with you? There are a number of district courts that have held 922N as unconstitutional. The McDaniel case from Wisconsin, which I cite in reply briefs. Give me a circuit court case because district court cases are nice, but we don't know how long they would last. So there have only been two that I'm aware of, two circuit cases addressing 922N. They both held the statute was facially constitutional. They did not address as-applied challenges. And, in fact, they both leave open the possibility that as-applied challenges could succeed. In fact, in the Kuro's case, which is the Fifth Circuit's case, the challenge is, strictly speaking, facial, but there's a part of the opinion toward the end where they do a sort of quasi as-applied analysis. And they note that the defendant in that case, his underlying felony was burglary. And they rely on the tradition of detaining people pretrial. And they note at the time of the founding, burglary was a capital crime in most states or it was a non-bailable crime in most states. And, therefore, it's likely that Kuro's himself would have been detained pretrial in 1791. And the clear implication there is, again, they don't say it expressly, but the implication is if someone were indicted for a crime that was not capital or analogous to a capital crime at the founding, then that tradition of pretrial detention would not apply to that person and 922N would be unconstitutional. I see I'm over my time, so unless the Court has questions, I'll save my time for rebuttal. Thank you, Mr. McBeth. Thank you. Mr. Medinger. May it please the Court, Your Honors, my name is Jason Medinger. I'm here on behalf of the United States. Your Honors, 922N is constitutional. It's constitutional facially, but it's also constitutional as it was applied to Mr. Jackson here. It's constitutional because it's consistent with this nation's historical tradition of firearm regulation, which has been confirmed by both the Fifth and the Sixth Circuit in recent decisions. Additionally, as we set forth in our briefs, we respectfully submit that the text of the Second Amendment doesn't even reach the as-applied challenge that Mr. Jackson is raising here. So for either or both of those reasons, we respectfully ask this Court to affirm. I'd like to start, if I could, with Bruin's Step 2, and the reason I'm doing that is because that's where Gore and Quiros went, and those are the Fifth and Sixth Circuit decisions. And so I think if we start there, we look at historical analogs, and we've identified three strands of historical firearm regulation that match up here. Mr. Medinger, before we get to that, so with respect to the as-applied challenge, the district court in this case, it seemed to be almost an afterthought at the very end of the opinion as to the merits of that claim. And I wonder why we wouldn't simply, if we thought that there was a concern with respect to fact-finding as applied to Mr. Jackson, why we wouldn't simply send this back and ask the Court to find some facts that would support the ruling in this case. Right. So we respectfully submit that the Court doesn't have to do that for a variety of reasons. I think the first one is the Hunt decision. That's what Judge Wynn was discussing earlier. In 922G1, this Court found we are not going to go felony by felony in an as-applied context to determine constitutionality. I can't see why 922N would be any different. I know Hunt came out after the briefing or our brief came in, so we didn't get a chance to flesh this out. But, again, I don't see why we would do that. Well, the difference is that we're talking about an indictment versus a felony. You don't think that's legally significant? I actually don't for purposes of this argument. And, again, we have to go back to the historical tradition. And so if we look at the historical tradition of what it meant to be a grand jury indictee, that actually meant something at the founding. So, you know, if you look at the Gore case, they looked at the famous Aaron Burr decision. And there was this clear divide between a complaint, yes, maybe Mr. Burr was bailable, but after that Chief Justice Marshall said, no, I doubt very much I have that power. So clearly there's this separation when you have a grand jury indictment. You get, as Judge Wynn was saying, this idea of dangerousness. And we have more than just a magistrate. What it means to be an indictee is that you're innocent until proven guilty. So I don't understand how there's this just presumption that he's dangerous. And particularly in this case, this goes back to sort of the why shouldn't the district court do some fact-finding here? Because particularly in this case, the thing that made him an indictee in federal court was dismissed in a few weeks after the federal indictment. So, Your Honor, just factually I'll say, yes, it was dismissed. Later they rebrought other charges which he pled guilty to. Right, that don't have anything to do with this firing. Understood, Your Honor. And so, again, I think we can leave those to the side. So we have to freeze frame what it was like at the time that he was transporting this firearm. So he was under a felony indictment. That's what we have to assume. I don't think we have to go back to fact-finding. It gets to the second point. Was it a felony indictment? For some reason I thought it was a misdemeanor, but go ahead. He pled to a misdemeanor later, but, yes, he was indicted for the felony, Your Honor. And so what we have to do is look at what would happen in 1791. And this gets to the second point I was trying to make with Judge Diaz about why I don't think fact-finding matters here, frankly. What we know is that he was a felony indictee. And so we have to go back to 1791 and ask ourselves, what would happen to a felony indictee at that time period? And you look at what Gore says and Quiroz says, it would have been pretrial detention. He would have been completely disarmed for that entire period. And so if that is the case, the lesser burden of 922N has to be. . . He wasn't disarmed here. I mean, two separate judges released him on his own recognizance and did not put any limitation on whether he could have a firearm. So even the fact. . .go ahead. So you're 100% right, Your Honor, in the sense that in 2022 judges didn't disarm him. I'll say as a footnote in the. . . We don't want to happen today. So you're 100% right. However, if we're looking at constitutionality, we have to put ourselves back in 1791. And that's why, if you look at the Gore and Quiroz defendants, both of those defendants were released pretrial too. And yet what those courts did is said what Bruin requires us to do is to look at. . . Is it only for the Second Amendment that we look at 1791? Well, under originalism, there's a number of constitutional rights that we look at 1791. But again, applying Bruin, we have to say what would the historical tradition have been in 1791? If you're accused of a felony, the uniform practice. . . That's the quote from Gore. The uniform practice is pretrial detention. And so if we send it back to the district court, she's going to say, okay, the uniform practice was pretrial detention. That meant disarmament. And so here in 922N, which is a lot lesser than complete and total disarmament, we're just charging him for transporting across state lines. There is no way he would be released. So we're at step two of Bruin in terms of where you're going now. At least in my view, it looks like a great big fiction that we've been put on us to go back and try to figure out what they did back in 1791 or anywhere else. But that is the law. That's what the Supreme Court has told us to do. And I think the direction you've taken, there is a presumption of innocence. But that presumption of innocence existed then, I guess, at that time. But felony was different then. I mean, felony was a much more serious thing back then. But nonetheless, you could be detained, could be removed of your gun rights, which could have happened here. The fact that you did not, how does that influence the as-applied analysis? If, in fact, while the historical analysis says these things could have been done, even now it could be done, if, in fact, the judge does not do that, if, in fact, the judge makes a statement, what if the indictment says, you are not a dangerous person, so I'm going to let you go, would that influence the analysis here? I don't think it does, Your Honor. If you look at the Bruin test, it requires us, again, to do this, let's assume we're all judges in 1791, what would happen? No, I wouldn't have been a judge in 1791. Understood, Your Honor. And so I think, you know, this is the test that we have to apply. And, again, both the defendants in Gore and Quiros were both released. I mean, so they were modern-day bailable persons. I'll note the defendant in Gore, just getting into as-applied, actually had firearms offenses. Those were his qualifying predicates, which is exactly what Mr. Jackson had here. And so, you know, if pretrial detention is the rule, then the lesser burden fits within that historical tradition. It's the lesser. Do we really have an as-applied analysis when we use the Hunt method, which looks like to me is really a categorical determination. And once you do that, you fit in that categorical, the as-applied nature of it doesn't apply, at least on a 922G. So the question is, do we do likewise with N? Right. And, Your Honor, my response is, you know, I don't see how one could say 922N, we're going to go felony by felony and use all these as-applied challenges. It just doesn't make sense. What the Court found in Hunt was Congress categorically can say these are dangerous groups. That's actually consistent with what the Supreme Court has said, too. It doesn't make sense except for Hunt. It would make sense, at least in my mind. But I think Hunt has basically gone there and says we don't do this by felony by felony. Now, this is indictment by indictment, but when you look at the two, if you're parsing out the term dangerousness and violence, well, felonies can be both violent and non-violent. It can be dangerous and non-dangerous. So Hunt folds all that in. But, you know, in terms of whether it makes sense, yeah, it does. But I think Hunt leads us differently, and we have to follow. I think that's right. I mean, I think this panel is obviously bound by Hunt. And, again, I just don't know how. And Hunt forecloses the as-applied challenge here is your argument. Yes, Your Honor. You have to make a facial challenge or somebody would have to make a facial challenge to this statute. That's correct. And, again, going back to the Hunt analysis and why it got there, it realized we can categorically say, Congress can categorically say these individuals are dangerous. And, obviously, they did it in 922G1. They did the same thing in 922N. It's part of the same statutory scheme. And so if we recognize they can do it in G1, how can we not recognize that they can do it in N? And, again, all of that is within the tradition, the historical tradition, of categorically excluding certain groups from firearm possession. And I will just note, you know, here, if it's allowed in Hunt, Hunt is a complete and total bar. You're a felon. You can no longer have guns forever. It seems clear to me that this defendant here, not that knowledge is something you have to have, had no knowledge or had no understanding that if he had that gun in that capacity, he could be found guilty under this statute. I mean, the way he openly just says I have it here and disclosed it, and maybe that's why the sentence is what it is, but I don't know what that means in the long run. But it seems something, most things you can kind of know. If you know you're a felon, it's pretty well known you can't have a gun. I mean, that's pretty much. But the fact that you've been indicted in another state and no gun restriction put on you and you can go and do what you please and you just come here and when you're stopped on something else that has nothing to do with the gun, and he says, well, you got anything? He says, yeah, I got a gun over there. Well, he didn't have to say that. Maybe they would have eventually gotten it or whatever, but I doubt it because they basically told him to go home. You know, it seems like something here that doesn't seem quite right, but the law may drive us in the direction that you point us to. Yeah, I think it does, Your Honor, and I'll say like that, the piece that you were talking about, sort of knowledge of the law and things like that, I think that goes to the substantive elements of intent, and here he conditionally pled guilty to everything, including his intent and knowledge of the law. The only thing he reserved conditionally was this constitutional challenge. So I don't think his knowledge of the law comes into play for what we're trying to decide here. I'm not sure it would matter even if it did. That's right, because ignorance wouldn't be a defense here. He has to know the law. And, again, I want to go back to what we are actually proscribing here. It's really not possession. We were proscribing transportation, and so, again, we have to look at was there a Second Amendment right, an unfettered Second Amendment right to cross state lines unfettered with firearms? And as we've set forth in our briefs, that was not the case. There is a number of colonial statutes which said you can't export things outside of the colony, and that applied to firearms, it applied to gunpowder, it applied to all sorts of things. So this idea of transporting across state lines, that's, you know, I'm brewing step one, if I could go there for a moment. That's what the defendant, his burden has to be, that in the colonial era, he had an unfettered right to go colony to colony transporting guns as he pleased, and there's absolutely zero support for that. In fact, we've proved the negative, in my view, in our brief, because there's a number of colonial statutes which say you can't do that. And so, you know, to even trigger the text of the Second Amendment, he has to show he has this right to transport, and it's just not there. So that's another basis on which this court could affirm, again, without having to do anything else with regard to the as-applied challenge. I wanted just to mention a couple brief comments in response to my colleague's discussions. We've mentioned this a bit, but my colleague was mentioning a lot about the, quote, unquote, unreliability of grand juries. I do respectfully park company with him on that. I do think grand juries matter, and that does mean something, certainly, for this analysis here. Again, that's what the founders believed, and it just makes a difference. When you're a grand jury indictee, you're going to go to pretrial confinement. There was some discussion about, in the briefs at least, about individualized findings, and we respectfully submit that there didn't have to be individualized findings. You can make a categorical determination here. That's what Rahimi said. You can do that without having an individual finding of dangerousness in this case, and this is what the court said in Hunt as well. We can have categorical bars, and that is completely okay. The other thing I wanted to mention was ‑‑ Well, let me ask you about that, because so Rahimi was a Step 2 Bruin case, right, not Step 1? Correct. Okay. And so Hunt concludes, based on the continued use or language in Supreme Court cases that presumptively warrants or sanctions the disarmament of felons, that suggests, according to the Hunt opinion, that we don't even get to Step 2. It's just not within the category of law-abiding people to whom firearms should be allowed to be kept or used in whatever fashion. But the Supreme Court has never said anything explicitly about indictees, right? So why do we assume that we're at Step 1 and not Step 2 of the analysis? So our Step 1 argument, the government's Step 1 argument, to be clear, is focused entirely on the transportation part. So we have actually not made a whether he's part of the people or not argument. That's an argument we're not making. So, you know, what he has to prove on Step 1 under our argument is a right to transport across state lines. You know, is that coextensive with the right to keep and bear? And what we've said is no, it's not. Keeping and bearing under what Bruin said, Heller said, is to keep on their person or in their pocket to be ready for offensive or defensive action. And here what's being proscribed is transport. He transported a gun and a vehicle across state lines. And if he stayed in Arizona, he could have kept in his possession for offensive or defensive action all the firearms that he had previously had in his possession. He couldn't get a new one, which he did here, but all the ones that he had in his possession he could have kept and used. What's being proscribed here is the transport. And, you know, again, if you look back to the founding era, that was not part of the right of keeping and bearing. You didn't have the unfettered right to go from Georgia to Massachusetts carrying guns. There was a lot of laws that said actually you can't. And so that's really what we focus on on Bruin's Step 1 is the transport, and that does not, it's not coextensive with keeping and bearing. What's the reason, what's the principal reason for restricting the transportation of it? I mean, you do have this right to be armed for self-defense, as long as you say in Arizona, but what's the principal reason for a non-valid felony in Daiti to not be able to transfer? Right. So if you look at the law review articles and historical sites and some of the case law on this, they talk about the fact that you didn't have the right to transport. The why of that was for a number of reasons. One, to protect the safety of the colony. So, in other words, you couldn't export guns away. We want to keep them here in state so that we can use them in case the British come back. Additionally, there was this concern about if guns go abroad, they might get into the wrong hands, and the wrong hands back in those times were Indian groups, folks that were deemed to be disloyal to the crown, things of that nature. And so it was sort of this same public safety belief that we have here, this idea that interstate highways are channels of interstate commerce. We don't want people that are deemed to be dangerous to be traveling in interstate commerce with a gun. And so this, again, 922N, is a very, very limited criminal proscription that's in line with this historical tradition which says you can't go from Georgia Colony to Massachusetts Bay Colony while transporting firearms. So there's just a number of analogs that show 922N is perfectly within the sticks of what was allowed in 1791 and, in fact, is quite lesser of a burden than what would have been allowed in 1791. And if we get there, if we know that this is a lesser burden that could have been imposed back in 1791, this has to be constitutional. And so that's where the government gets to its argument to ask that we respectfully affirm. So, Your Honors, I think the Court has heard our arguments. Unless there's anything further, I'll cede the rest of my time. Thank you, Mr. Mettinger. Thank you, Your Honor. Mr. McBeth. Thank you, Your Honor. A couple points. First, going back to Hunt and this idea of categorical disarmaments, certainly Hunt does say that in some circumstances Congress can make a categorical judgment that a group is dangerous even if not every individual is. But, again, there has to be a limit to that principle. Otherwise, Congress could disarm everyone. It could say redheads can't have guns. Left-handed people can't have guns. People who wear hats can't have guns. And if courts are just meant to defer to that without any scrutiny and accept at face value Congress's judgments, then Congress has exactly the regulatory blank check that Bruin says legislatures are not supposed to have. So there must be some determination of whether it's actually reasonable to deem that group dangerous as a whole. And for all the reasons I've said, I don't think there's a basis for that as to indictees. Make that clear to me, the connection. You have indictees and redheads. There's no basis. And, Walter, I know that you can simply be detained because you have a redhead, or you can have a gun and take a restriction. But if you are an indictee, you can. So it seems like the category is – I get your point. You seem not to have a limiting principle. But we're talking about indictees, again, which has that temporal level. It can be a temporary situation. At some point in time it's either going to be convicted or not. Or you could be detained, you could be restricted, but that's not true with redheads. So on the detention point, Your Honor, I think for the reasons that are in my brief, I think detention, pre-trial detention, is just completely irrelevant to people who were not detained. Back in 1791 when people were detained and their guns were taken away, the reason for that was that you can't run a jail if the inmates have guns. So the safe and orderly operation of a jail requires taking guns away from inmates. But that rationale just has nothing to say about people who are not actually detained. And Mr. Jackson was not actually detained. So the fact that he could have been detained or disarmed if he had been detained is just irrelevant. It's speaking to a category of people that Mr. Jackson does not fall into. The government also said a minute ago essentially that if you were indicted at the founding, then you were detained, sort of a blanket rule. That is not accurate. So it is true that in some jurisdictions if you were indicted for a capital crime, you were presumptively detained. But contrary to what the government is suggesting, it's not the case that all or even most felonies were capital at the founding. And we talk about this in our brief. That's a misconception. There were many, many felonies at the founding that were not capital. And for those people, an indictment did not mean that you were detained. So at most, what that analogy establishes is that 922N is facially constitutional because some people who committed capital crimes were detained, and those people today could be disarmed. And that is all that Gore and Quiroz say. They don't address as applied challenges. So if the government is going to say that that analog applies here, they would have to show that Mr. Jackson's underlying felonies either were capital in 1791 or at least are analogous to crimes that were capital in 1791. And the government has not even tried to make that showing. Finally, on the step one question, we addressed the laws the government cites in our reply brief. The how and the why of those laws are very different from 922N's. As to the how, those laws were commercial regulations. They prohibited selling or giving away guns to groups outside the polity. They did not restrict the individual right to self-defense of anyone who was subject to those laws. That is entirely different from 922N, which prevents people subject to the law from exercising self-defense with a firearm. And the why was very different as well. As Mr. Mettinger just acknowledged, the purpose of those laws was to ensure that there were enough guns in the polity. It was to make sure guns stayed with the people and didn't get sent away where people who were not members of the political community could get them. So it's very different from 922N, which is meant to restrict the right to bear arms of people within the polity. And unless the Court has any more questions, I will stop there. Thank you, Mr. McBeth. Thank you, Your Honor. I want to thank both of you for your excellent arguments. I will note that, Mr. McBeth, when you suggested that Congress could disarm redheads, I have a redhead extern in my chambers, and she was shaking her head vigorously, no. I agree. We'll come down and greet counsel and take a recess before moving on to our third case. This Honorable Court will take a brief recess.
judges: Albert Diaz, James Andrew Wynn, Stephanie D. Thacker